Exhibit 1

Case 3:05-cv-00172-TMB     Document 46-2     Filed 09/18/2006     Page 1 of 12

The contractor and any agents and employees of the contractor in an independent capacity and are not officers or employees or agents of the State in the performance of this contract.

### Article 9. Payment of Taxes.

As a condition of performance of this contract, the contractor shall pay all federal, State, and local taxes incurred by the contractor and shall require their payment by any Subcontractor or any other persons in the performance of this contract. Satisfactory performance of this paragraph is a condition precedent to payment by the State under this contract.

### Article 10. Ownership of Documents.

All designs, drawings, specifications, notes, artwork, and other work developed in the performance of this agreement are produced for hire and remain the sole property of the State of Alaska and may be used by the State for any other purpose without additional compensation to the contractor. The contractor agrees not to assert any rights and not to establish any claim under the design patent or copyright laws. The contractor, for a period of three years after final payment under this contract, agrees to furnish and provide access to all retained materials at the request of the Project Director. Unless otherwise directed by the Project Director, the contractor may retain copies of all the materials. This provision's application shall be limited to inmate records or the records related to performance of this contract.

### Article 11. Governing Law.

This contract is governed by the laws of the State of Alaska. All actions concerning this contract shall be brought in the Superior Court of the State of Alaska.

### Article 12. Conflicting Provisions.

Unless specifically amended and approved by the Department of Law the General Provisions of this contract supersede any provisions in other appendices.

### Article 13. Officials Not to Benefit.

Contractor must comply with all applicable federal or State laws regulating ethical conduct of public officers and employees.

### Article 14. Covenant Against Contingent Fees.

The contractor warrants that no person or agency has been employed or retained to solicit or secure this contract upon an agreement or understanding for a commission, percentage, brokerage or contingent fee except employees or agencies maintained by the contractor for the purpose of securing business. For the breach or violation of this warranty, the State my terminate this contract without liability or in its discretion deduct from the contract price or consideration the full amount of the commission, percentage, brokerage or contingent fee.

Exhibit 2

1  Q.  Did you then seek medical treatment related to
2  the May 29, 2003 incident?
3  A.  I have a number of questions about that,
4  Ms. Holsman, yes.
5  Q.  You went there May 29, 2003, received about 20 to
6  30 minutes of care and you returned back for a follow-up a
7  couple of days later?
8  A.  Yes.
9  Q.  You said that you made contact with a contract
10 monitor.  Did you make contact with the contract monitor
11 related to this May 29, 2003 incident?
12 A.  I think so.  If I remember correctly we talked.
13 It was -- I may have my dates messed up, Ms. Holsman, I'm
14 not sure, I'm pretty sure it was her and Miss Matlock, the
15 unit manager, I think it was at that time they were made
16 aware of my condition, at least with Miss Matlock, unit
17 manager.  But she kept -- I don't know, it was just with
18 the issue of my medical condition being as serious as it
19 was, that was when I think Miss Matlock, she tried to be
20 more aware of certain stuff with regards to me.  Other
21 than that, no, that was it.  That was the gist of it.
22 Q.  When you say "medical condition" you're referring
23 to your heart condition; correct?
24 A.  My medical condition, period.  They seemed to not
25 to have known that I guess I had that and how serious it

Exhibit 3

John O'Steen, M.D.
1155 N. Pinal Parkway
Florence, Arizona 85232

April 16, 2006

Jennifer L. Holsman
Jones, Skelton & Hochuli, P.L.C.
2901 North Central Avenue, suite 800
Phoenix, Arizona 85012

RE: William R. Bailey v. CCA, etal
William R. Bailey v. CCA & Luna

Dear Ms. Holsman:

Recently I have had the opportunity to review numerous documents concerning the above referenced cases filed by Mr. William R. Bailey. The items submitted to me by your firm are well delineated in your correspondence to me dated March 30, 2006.

Mr. Bailey claims that shortly after his incarceration at CCA's Florence Correctional Center in March of 2003, he was told by a provider that the Relafen he was previously taking for his arthritis was not available and Clinoril would be substituted. He asserts that when he picked up his new arthritis medication he was inadvertently given another Inmate's medication for Lovastatin, a cholesterol lowering medication, which he took for ten days before discovering the error. He alleges that he developed severe nausea, dizziness, abdominal cramping and heart palpitations as a result.

Medications at CCA facilities are prepared by Diamond Pharmaceutical Company and are blister pacs clearly marked with the individuals full name and identification number. The Inmates are required to sign for and acknowledge receipt of the medications which are dispensed by licensed nursing staff. Clearly, the Inmates have a personal responsibility to verify the identification on the card and the medications contained within the card before ingesting them. To not do so would be negligence on their part.

Shortly thereafter the Inmate was seen by Dr. Singh, a licensed physician at the facility, and was examined with no significant abnormal findings other than mild elevation in his blood pressure. Mr. Bailey was reassured by Dr. Singh and told that this was "an innocent harmless mistake." Mr. Bailey remained at this facility throughout the

remainder of the year. He was seen numerous times for multiple different complaints and was transported to the hospital where he received an extensive medical evaluation twice for complaints of chest pain. He never again voiced any complaints that could be associated in any way with this alleged 10 day ingestion of Lovastatin and no testing suggested an adverse impact on Mr. Bailey from this medication. There is nothing in this medical record that would suggest Mr. Bailey suffered any serious or prolonged adverse effects from this event. If this event occurred, it was indeed relatively harmless as indicated by Dr. Singh. The evaluations by the Health Care Providers of this individual during this period clearly met the Standard of Care.

Further, even if he received this medication card for Lovastatin there is no evidence that he actually took them. In a request for interview submitted to the Alaska Department of Corrections dated 2/15/03 prior to his transfer to Arizona he was clearly displeased about the transfer, predicted that his medical needs would not be met in Arizona and closed the request with the statement, "see you in court." Review of the medical record showed that Mr. Bailey had been on multiple medications for greater than 20 years and seemed well versed in his medication regimen.

Subsequent to this event the Inmate was ordered transported to the hospital via ambulance for evaluation of chest pain on May 28, 2003. The Inmate alleges that on his return to the prison by facility van the following day the air conditioning unit was not properly functioning and that he became quite ill, eventually sustaining a syncopal episode witnessed by a Lieutenant at the facility. He stated that the correctional officers transporting him knew of his serious medical condition and should have taken action to ensure that he did not become overheated. Interestingly, the medical record shows that he was seen on the day of his return form the hospital by Mr. Green, a Physician's Assistant, who reported Mr. Bailey was "asymptomatic." Had such a syncopal episode occurred in the reception area a medical emergency would have been called and he would have been transported to the medical unit on a stretcher for immediate evaluation. This does not seem to have occurred.

It should be noted that Mr. Bailey's complaints have been quite consistent over the past twenty plus years. He tends to complain of chest pain, palpitations, left testicular pain, low back pain and bilateral knee pain. He has been admitted to the hospital on more than four occasions for evaluation of chest pain since 1985 and no serious heart condition has ever been found. During his last admission in Arizona it was pointed out that his chest pain was felt to be non-cardiac in origin. Mr. Bailey is either prone to hyperbole or alternatively chooses to distort the truth for his own benefit.

This is further substantiated by his reluctance to release his previous medical records which showed a clear pattern of prescription drug abuse and cocaine abuse as late as 2001. He was dismissed from the care of his attending Physician, Dr. Ticman, in August 2001 when his second drug screen in three months came back positive for opioids and cocaine. Such individuals are often known to be deceptive and manipulative. He also failed to disclose to the health care providers in Arizona that he was Hepatitis C positive,

a condition often associated with drug abuse.

Following this second alleged event, which does not seem to have occurred as Mr. Bailey described it, he continued to receive adequate and appropriate health care at FCC in Arizona which clearly met the Standard of Care for this locale and this is well documented in his medical record.

If you should have any further questions concerning this matter feel free to contact me at any time.

Respectfully Yours,

John O'Steen, MD

John O'Steen, M.D.

# John T. O'Steen, M.D.

745 E. Taylor Trail
Queen Creek, Arizona 85243
480-882-9702
AJ1313420@msn.com

## Education

**Residency Program:**
07/80 to 06/81

  Maricopa County General Hospital
  2601 East Roosevelt
  Phoenix, Arizona 85008
  (602) 267-5011

  Psychiatry Resident

  National in-service residency exams after
  6-months of training:
  Neurology --- 99th percentile
  Biological psychiatry --- 99th percentile
  General psychiatry --- 94th percentile

  Robert St. John, M.D., Director
  Psychiatric Residency Training Program

**Flexible Internship:**
07/79 to 06/80

  University of New Mexico Hospital
  Albuquerque, New Mexico 87131

  Joseph M. Bicknell, M.D., Director
  Department of Neurology

**Medical School:**
08/75 to 06/79

  University of Michigan Medical School
  Ann Arbor, Michigan
  M.D. Degree granted June 30, 1979

  Received honors designation in an extensive two year
  Neuropsychiatry program with elective courses in advanced
  Microanatomy and a clinical preceptorship at the National
  Institutes of Mental Health.

  National Board Scores Parts I & II greater than the 97th percentile.

**University:**
07/69 to 06/70
07/72 to 08/75

        Arizona State University
        Tempe, Arizona
        B. S. Degree in Zoology granted August 1975

        Graduated Summa Cum Laude, Elected to Phi Beta Kappa in
        Junior year, member of Phi Kappa Phi, Phi Eta Sigma and Beta
        Beta Beta academic honor societies.

**Military Service:**
12/65 to 07/69

        United States Navy

        Honorable Discharge

        Advanced to the rate of First Class Petty Officer in a
        minimum time period: Fleet wide advancement in rating test
        Scores within the 99th percentile: Received letter of commendation from the
        Commander in Chief of the Pacific Fleet for meritorious achievement while
        Serving with the 7th Fleet in Viet Nam.

        Responsibilities included the maintenance of electronic navigational equipment
        And internal electronic alarm and communication systems in addition to
        Supervision of junior petty officers.

**EMPLOYMENT:**

07/2003 to Present:

        Correctional Corporation of America
        Central Arizona Detention Center
        Florence, Arizona

        Medical Director responsible for providing primary health care
        To approximately 3,200 Federal Detainees with, on the average,
        1,000 new admissions per month. In addition, responsible for the
        Supervision of three mid-level health care practioners.

11/99 to 04/2003

        Arizona Department of Correction
        Inmate Health Service
        Florence, Arizona

        Promoted to Physician Supervisor in charge of the
        Arizona State Prison Complex at Florence. In addition to direct

          patient care, responsible for supervising and evaluating 5
          Physicians, 1 Physician Assistant, 1 Lab Technician and 1 X-ray
          Technician. Directly responsible for the health care of 3,500
          Male inmates at the medium and maximum security units at
          Florence. This inmate population contains a far higher percentage of
          Serious chronic and acute health care problems than exists, on the
          Average, in a private population of similar size, significantly increasing my
          Experience in the treatment of HIV, AIDS and Hepatitis C in particular.

**11/98 to 11/99:**

          Arizona Department of Corrections Inmate Health Services
          Florence, Arizona

          Directly responsible for comprehensive acute and chronic health care
          To a male population in a maximum-security unit of the Arizona State
          Prison Complex at Eyman.

**02/92 to 06/98:**

          Solo general practice in Casper, Wyoming providing a broad range of medical
          Services to all age groups. Supervised one full time physician's assistant and
          One part time nurse practitioner. Admitting privileges at Wyoming Medical
          Center in the Department of Family Practice, and at Crestview Psychiatric Hospital.

**08/89 to 12/92:**

          Solo general practice in Eloy, Arizona providing a broad range of medical services
          To all age groups. Supervised two full time physician assistant at the Coolidge and
          Eloy location. Admitting privileges at Casa Grande Regional Medical Center in the
          Department of Family Practice.

**05/88 to 08/89:**

          West Pinal Family Health Center
          801 North Main Street
          Eloy, Arizona

          West Pinal is a private non-profit organization originally designed to provide
          Primary medical care to low income and indigent members of the community.
          Provided general practice medical services to all age groups with admitting
          Privileges in the Department of Family Practice at Casa Grande Regional
          Medical Center.

**05/87 to 10/87:**

          Solo general practice in Chandler, Arizona providing comprehensive general
          Medical care to children, adolescents, and adults with admitting privileges at
          Chandler Regional Hospital.

**09/82 to 02/87:**

Solo general practice in Eloy, Arizona with admitting privileges at Casa Grande Regional Medical Center. Involved in the diagnoses and management of an Extremely broad range of medical, psychiatric and surgical problems with care Provided to a largely minority and indigent population. Directly responsible for the Management of complex acute medical problems involving treatment in the intensive Care unit and sub acute care unit as well as more common and less acute problems On the general medical wards. In addition comprehensive OB care was provided by myself for this population.

## Awards and Appointments:

Voted Doctor of the Year at Casa Grande Regional Medical Center 2 years in row. 1991 and 1992

Medical Director, Regional AHCCCS Health Plan, Oct. 1989 to April 1992

Chief to the Department of Family Practice, Casa Grande Regional Medical Center. 1989 and 1990

References Available Upon Request